## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

| | | |
|---|---|---|
| **NICHOLAS PRICE** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.:** 5:23-cv-00010 |
| | ) | |
| **PHILLIP WHITE, KYLE** | ) | |
| **SMITH, DERINDA DAMERON,** | ) | **Jury Trial Demanded** |
| **NURSE HARLOW, V. DAMEN,** | ) | |
| **OFFICERS MYCK,** | ) | |
| **CROOKSHANKS, and** | ) | |
| **WILLIAMS** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## COMPLAINT

Plaintiff Nicholas Price files this action against Defendants White, Smith, Dameron, Harlow, Officers Myck, Crookshanks, and Williams, pursuant to 42 U.S.C. § 1983 and Virginia law against the Defendants, to vindicate his rights and to seek an award of damages resulting from the pain and suffering caused by Defendants in failing to provide adequate medical treatment. Plaintiff also seeks an award of punitive damages for the conscious disregard for his rights.

## INTRODUCTION

Plaintiff Nicholas Price was playing basketball at the Augusta Correctional Center on March 6, 2021 when he jumped up for a layup and landed wrong on his legs. He immediately knew something was wrong and laid there on his back as those around him tried to figure out how to get him to the medical building for help. As he tried to stand, he found both of his kneecaps were out of place and immediately swollen. He could not bend his knees, and the pain was overwhelming. He was eventually put onto a stretcher, but it was difficult to roll the stretcher across the grass between the basketball court and the medical building. The officers and nurses around Nicholas just sat and watched while Nicholas had to rely on the help of two other inmates by wrapping an arm around each of their necks to be carried to the medical unit.

Though Nicholas later found out that he had fractured both of his patella bones in his knees and ruptured his patellar tendons, he had to wait two days to be assigned to the medical unit, eight days to be sent to a hospital, and he received inadequate pain medication (the strongest medication he was given pre-surgery was ibuprofen). Worse, Nicholas was forced to stand multiple times a day or risk an institutional disciplinary charge and was forced to walk multiple times, sometimes even to be seen by the medical staff in the prison.

After arriving at the medical unit with the help of his fellow inmates, Nurse Harlow did not take Nicholas's injuries seriously, "treating" him with icepacks and ibuprofen. Nurse Harlow failed to assign Nicholas to the medical unit, sending him back to his cell with a pair of crutches—useless to someone with two injured legs. Nurse Harlow failed to prescribe Nicholas effective pain medication, order leg braces, or provide any assistance to Nicholas. Significantly, Nurse Harlow failed to send Nicholas to the hospital to receive the evaluation he urgently needed.

Up until he was sent to the hospital, Nicholas submitted multiple emergency grievances pleading for help, making statements such as "I need to go the hospital," my knees are in excruciating pain," "I can't bend both my knees," "I can't take care of myself any longer and need medical help," No one is taking me seriously," "I can't even sit on the toilette and I need help." Nurse Damen and Nurse Harlow responded that he was already receiving crutches and ibuprofen and would have to wait until that Monday to have a follow-up appointment.

Nicholas had to rely on his cellmate to use the bathroom and could not sleep, because the pain was so agonizing. When he finally did get to a hospital, they admitted him right away and had performed surgery on both knees within days. However, when Nicholas arrived back at the Augusta Correctional Center, medical staff told him they did not have to honor the physical therapy he was ordered to do twice a week. When he did receive physical therapy, it was not effective. This lack

of adequate care led to a back injury because he was unable to walk with an even gait. The back injury prevented him from being able to participate in the limited physical therapy he was receiving, and he had to submit yet another emergency grievance just to be re-enlisted in physical therapy after he recovered from his back injury.

Nicholas Price entered prison to pay his price to society. His punishment would not have included the pain and suffering he has endured, or the continued limitations to his legs but for the incompetence and apathy of the Defendants.

## JURISDICTION AND VENUE

1.

This action arises under 42 U.S.C. §1983 and the Eighth Amendment to the United States Constitution. Jurisdiction is proper under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(4) under 42 U.S.C. §1983. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C § 1367(a), because the state law claims form part of the same case or controversy as the federal law claims.

2.

Venue is proper in under 28 U.S.C. §1391(b) and W.D. Va. Civ. R. 2(b) because (1) upon information and belief, Defendants reside and transact business in this District and Division (2) a substantial part of the events or omissions giving rise to Mr. Price's claims occurred within this District and Division.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

3.

Plaintiff has exhausted all administrative remedies available to him through the Virginia Department of Corrections and the Augusta Correctional Facility.

## PARTIES

4.

**Plaintiff Nicholas Price** is a citizen of the United States of America and the Commonwealth of Virginia, and an offender incarcerated by the Virginia Department of Corrections ("VDOC"). At all relevant times, Nicholas has been housed under the custody of the VDOC at Augusta Correctional Center ("ACC").

5.

At all times relevant to this action, **Defendant Phillip White** was the Warden of Augusta Correctional Center and an employee of the VDOC. White was responsible overseeing the administration of medical care to Nicholas Price and for knowing all applicable laws regarding the treatment of inmates under the VDOC's care, custody, and control, including medical treatment. At all times relevant, he acted under color of state law.

6.

At all times relevant, **Defendant Kyle Smith, MD,** is a United States citizen, and at all relevant times was a medical provider with ultimate authority over

Nicholas's medical care while Nicholas was incarcerated at the ACC. Defendant Smith at all times relevant acted and will continue to act under color of state law. At all times relevant, Defendant Smith was responsible for knowing all applicable laws regarding the constitutional protections of inmates under the ACC's care, custody, and control.

7.

Defendant **Derinda Dameron, RN** is a United States citizen, and at all relevant times was a medical provider with ultimate authority over Nicholas's medical care while Nicholas was incarcerated at the ACC. Defendant Dameron at all times relevant acted and will continue to act under color of state law. At all times relevant, Defendant Dameron was responsible for knowing all applicable laws regarding the constitutional protections of inmates under the ACC's care, custody, and control.

8.

Defendant, **Harlow, RN,** is a United States citizen, and at all relevant times was a medical provider with ultimate authority over Nicholas's medical care while Nicholas was incarcerated at the ACC. Defendant Harlow at all times relevant acted under color of state law. At all times relevant, Defendant Harlow was responsible for knowing all applicable laws regarding the constitutional protections of inmates under the ACC's care, custody, and control.

9.

Defendant **V. Damen, RN**, is a United States citizen, and at all relevant times was a medical provider with ultimate authority over Nicholas's medical care while Nicholas was incarcerated at the ACC. Defendant Damen at all times relevant acted and will continue to act under color of state law. At all times relevant, Defendant Damen was responsible for knowing all applicable laws regarding the constitutional protections of inmates under the ACC's care, custody, and control.

10.

Defendants, **Myck, Crookshanks, and Williams (hereinafter "Defendant Officers")** were officers employed by the VDOC at all times relevant to this action. Defendant Officers are United States citizens. Defendant Officers at all times relevant acted and will continue to act under color of state law. At all times relevant, Defendant Officers were responsible for knowing all applicable laws regarding the constitutional protections of inmates under the ACC's care, custody, and control.

## STATEMENT OF FACTS

**I.     Nicholas Price is seriously injured while exercising and is forced to seek help from inmates to make it to the medical building as prison staff watch.**

11.

Nicholas Price injured both knees around 2:50pm on or about Saturday, March 6, 2021 while exercising in Augusta Correctional Center's recreation area.

12.

Nicholas was playing basketball outside during recreation time when he landed wrong, bearing his weight on his left knee.

13.

Immediately, both knees popped, and Nicholas fell to the ground and rolled onto his back, lying there in pain.

14.

The first thing Nicholas noticed was that both of his kneecaps were severely swollen, and it felt as if he were being kicked in each knee. His left kneecap had shifted and was positioned higher on his leg than usual. He felt as if he might vomit or lose consciousness from the pain.

15.

Nicholas would later find out that the pain was so excruciating because his patella bones on each knee were fractured and the patellar tendons on both sides were ruptured.

16.

One of the officer's present during the injury, Officer Perry, the first officer to arrive on the scene, told Nicholas that he had experienced the same injury before. Officer Perry knew that the patellar tendon was probably snapped and called the injury in to medical as a serious possible compound fracture.

17.

In response to Officer Perry's call, Nurse Harlow, Lieutenant E. J. Scott and one other officer brought a stretcher to the basketball court.

18.

The medical building was approximately 100 yards away from the basketball court, and they would have to cross a grassy area, and walk up a little hill, to reach the medical building.

19.

Nicholas laid on the ground for 30 minutes before a few officers who had been present tried to help him up and put him on a rolling stretcher; Mr. Price's legs were locked straight, not being able to bend.

20.

The officers brought a stretcher to place Mr. Price on but could never get him on it due to his size and his legs being locked straight (at this time, Mr. Price was 6'3, 252 pounds); as result, they made Mr. Price walk to medical, over 100 yards away, and made inmates help him walk—Mr. Price was in excruciating pain, so much so, he thought he was going to pass out especially after lifting his pant leg up and saw that his knee caps were about three inches above their normal position, towards his quadriceps.

21.

In fact, once the inmates had Nicholas upright, Nurse Harlow left to the medical unit instead of escorting Nicholas. By the time Nicholas finally made it to the medical unit, Nurse Harlow had already been waiting there.

## II.     Nurse Harlow gives Nicholas ibuprofen and crutches even though he could not walk, and his emergency request for treatment is denied.

22.

After arriving at the medical building, Nicholas was seen by Nurse Harlow.

23.

Upon information and belief, after seeing Nicholas' legs, Nurse Harlow called Dr. Smith to discuss treatment.

24.

Nurse Harlow saw (1) that Mr. Price's legs were locked out and (2) Mr. Price's knew caps were now dislodged and in a place about 3 inches towards his quadricep; Nurse Harlow's "treatment" was mere ibuprofen and bags of ice for the severe swelling and two crutches, even though—because both knees were seriously injured—he could not walk or even bend his legs.

25.

Nurse Harlow told him that he would be alright and that his knees would likely swell even more before telling him he could walk back to his housing unit; Nurse

Harlow took zero steps to start the process of Mr. Price going to an off site medical center such as a hospital, or even the process for getting an x-ray.

### 26.

Nicholas asked if he could bring the bags of ice back to his bunk with him, but Nurse Harlow refused him even that small amount of relief.

### 27.

After being denied even the bags of ice for his injuries, Nicholas lifted his shorts to show his legs to another Nurse, Nurse Gentry.

### 28.

Nicholas asked Nurse Gentry, "Does this look okay?" Nurse Gentry told him it was Nurse Harlow's decision and that there was nothing she could do.

### 29.

Nicholas Price's kneecaps were approximately three inches higher than they were supposed to be.

### 30.

The entire visit took approximately ten minutes; the walk back to his dorm took Mr. Prices 10-15 minutes to get back—the walk usually took him about two - three minutes.

31.

Throughout that night (March 6, 2021), Nicholas struggled to move around and complete basic tasks. If he needed to use the bathroom, he had to wake up his cellmate, William Griffith, who helped him as well as he could. Nicholas had to lay his boxers on plastic and shimmy into them just to get dressed. He could not even stand up long enough to take a shower.

32.

Nicholas's knees started to turn purple and swell even more. The pain continued to worsen to the point that he could not even get to pill call.

33.

Around 5:30pm, on March 7, 2021, Officer Wilbarger, was conducting security rounds that Saturday night in Nicholas' pod (Pod D2).

34.

During security rounds, Nicholas was sitting propped up in a chair in the common area of the pod when Officer Wilbarger saw him. Nicholas showed Officer Wilbarger his disfigured knees.

35.

Officer Wilbarger told Nicholas that his injury looked serious and that it could be "pretty bad" if he did not get it looked at by medical personnel.

36.

Due to his worsening condition, and his conversation with Wilsbarger, Nicholas filed an emergency grievance at 6:07pm that night, stating, "My knees are in excruciating pain, I can't bend both my knees and my kneecaps are dislocated and swollen. I need to go to the hospital[.]"

37.

Nurse V. Damen responded to Nicholas's request, categorizing it as a "non-emergency" and replied that he had already been ordered crutches and ibuprofen and would have a follow-up appointment on Monday, March 8th.

38.

Although the grievance was signed at 6:25pm, Nicholas did not receive any

response until hours later, around 8:30pm.



39.

The grievance response was the only notification of a follow-up appointment

that Nicholas had received, and that follow up made him wait until Monday with his

excruciating medical condition.

40.

The medical staff, including Nurse Harlow and V. Damen, refused to even take a second look at Nicholas's injuries or address his concerns in any way.

**III.   Correctional staff repeatedly forces Nicholas to stand, walk, and even take stairs while enforcing Augusta Correction Center's inflexible policies.**

41.

Augusta Correctional Center has a policy requiring inmates to stand four times each day, for head count in the morning, lunch, shift change, and then at night.

42.

If an inmate fails to stand during these times, they receive institutional disciplinary charges.

43.

After his injury on Saturday, Nicholas could not bend his legs to properly stand up and sit down as required by this policy. Regardless, staff demanded Mr. Price stand up while knowing of his injury.

44.

Nicholas repeatedly asked Sergeant Williams, **Myck, and Officer Crookshanks, and Williams**, along with Nurse V. Damen, to take him to medical and all these refused to take him to medical or even begin the process for him to be taken to medical.

45.

Officer Wilbarger also told Nicholas, that he would have to help himself. Specifically, Officer Wilbarger told Nicholas that the only way something would be done about his legs is if Nicholas refused to return to his cell.

46.

Distressed by the gross lack of treatment, Nicholas realized Officer Wilbarger was probably right and waited outside of his cell door, refusing to lock down at 11:30pm until he was properly seen by medical staff.

47.

Instead of getting Nicholas to the medical unit to be treated, officers told him he was wanted in the watch office for refusing to lock down.

48.

Absurdly, around midnight, officers made Nicholas walk to a sallyport where he was left to wait for hours until officers told him it was time to go to the watch office.

49.

At 2:00am, Nicholas was made to walk to the watch office slowly and painfully and without assistance—an office that required walking up steps to get to. The two officers that escorted him offered no assistance.

50.

When Nicholas eventually made it to the watch office, he arrived to find prison staff sitting behind desks. He showed them his swollen, purple knees and his kneecaps which were clearly resting higher on his legs than their proper positions. He told them he was in excruciating pain. He told them he could not take care of himself. He asked to be taken to the hospital and treated right away.

51.

Instead of getting Nicholas the urgent medical attention he needed, the prison staff told him that going to the hospital that night would be a waste of time, because the doctors at the hospital would say the same thing—that nothing could be done that night—and would send him back to the prison.

52.

Nicholas was forced to walk back to his cell, again unassisted, at 3am in the morning.

**IV.    The day after his injury, Nicholas again desperately requests emergency treatment but is again denied.**

53.

On Sunday, March 7th, 2021, around 1:25pm, Nicholas submitted another emergency grievance, pleading to properly treated.

54.

Nicholas wrote, "I am in extreme pain from knee injuries I had yesterday. I can't take care of myself any longer and need medical help. No one is taking me seriously and I believe I have real serious damage to both my knees. I can't even sit on the toilette and I need help[.]"

55.

Despite the increased urgency in the request and the time-sensitive concerns–i.e. not being able to sit on a toilet or take care of himself–as well as pain that was unsurprisingly "extreme" even after receiving ibuprofen, the grievance was recategorized yet again as a "non-emergency."

56.

In response to the March 7th emergency grievance, Nurse Harlow wrote in

reply, "Please continue medication as ordered. You have been scheduled for a follow

up with the doctor."



57.

Although the *emergency* grievance appears to have been received at 2:17pm,

Nurse Harlow did not respond until hours later, around 5:30pm.

**V.     On Monday, March 8th, Nicholas is finally assigned to the medical unit, but prison staff continue forcing him to walk.**

58.

That Monday, Nicholas found out that his appointment that day was now being pushed back until Tuesday, March 9th. Nicholas was so desperate for medical care that he attempted to walk himself to the medical unit. He was stopped by officers and turned back to his cell.

59.

After being turned back to his cell, eventually, Nicholas was permitted to be escorted to medical, and was assigned to the medical unit by Head Nurse Dameron. Nurse Dameron also finally ordered x-rays of Nicholas's knees; the x rays were done on Tuesday March 9, 2021.

60.

Nicholas was given a walker and a bedpan while assigned to the medical ward. He was then left without anyone to provide assistance.

61.

Although Nicholas was finally assigned to the medical unit, he was still made to walk that day by prison staff. Nicholas was called to the security booth by Officer Myck who told Nicholas that he did not want to be held liable and that Unit Manager Crookshanks did not want to be held liable. As if that was not enough, Nicholas was

then told to go into the entryway to speak to Sergeant Williams. Williams reiterated that they did not want to be held liable for Nicholas's knee injuries.

## VI.   Dr. Smith forces Nicholas to walk to his office to have x-rays taken, delays giving Nicholas the results, and demeans Nicholas for requesting further treatment.

### 62.

On March 9th, 2021, Nicholas saw Dr. Smith.

### 63.

Again, the x-rays of Mr. Price's knees were taken on Tuesday, March 9, 2021, and Dr. Smith told Mr. Price that the x-ray results would be back that day, so he could discuss them with Nicholas before he, Dr. Smith, went home.

### 64.

After hearing nothing from Dr. Smith, Nicholas returned to the office, but Dr. Smith was already gone. Needless to say, Dr. Smith did not contact Nicholas that day.

### 65.

Upon information and belief, unbeknownst to Nicholas, Dr. Smith had received the x-ray images the same Tuesday they were taken but did not take action for further treatment or discuss the results with Nicholas.

66.

On Wednesday, Nicholas was called back to Dr. Smith's office to discuss the x-ray results, again only after being forced to get himself there without assistance from staff.

67.

Dr. Smith told Nicholas that the x-ray showed both of Nicholas' kneecaps were fractured and shifted out of alignment.

68.

During their discussion, Dr. Smith actually told Nicholas that he had received the x-rays back on Tuesday, the very day they were taken.

69.

When Nicholas asked why Dr. Smith had not called Nicholas back on Tuesday, Dr. Smith began to get upset with Nicholas. In fact, when Nicholas told Dr. Smith that he needed to go to the hospital immediately and asked why his injuries were not being treated with any sense of urgency, Dr. Smith replied, "What do you want me to do, lay you down right here and perform major knee surgery?"

70.

Dr. Smith sent Nicholas back to the medical unit, without any additional/different medications or treatment plan. Upon information and belief on that day Tuesday, March 7, 2021, Dr. Smith took no action—although having the

authority to do so-- to send Mr. Price to an outside medical provider such as an emergency medical department/hospital, to have Mr. Price's knee examined and treated immediately.

**VII.   More than a week after fracturing both patella bones and rupturing his patellar tendons, Nicholas is finally taken to the emergency room where he has urgent surgery on both knees.**

71.

On Saturday, March 13th, 2021, after eight days of excruciating pain, Nicholas was taken by ambulance and admitted to Augusta Medical Center's emergency department.

72.

Doctors at Augusta Medical Center took more x-rays and did an MRI. The doctors decided that day that Nicholas would need surgery on both knees right away and admitted him to stay at the hospital until his procedure.

73.

Three days later, on Tuesday March 16th, Nicholas underwent a double knee surgery. Both surgeries were done at the same time by having a different surgeon for each knee.

74.

Not only were both of Nicholas' kneecaps fractured, but the patellar tendons on both legs had been ruptured and his quad muscles had rolled up his legs and had to be pulled back down into place.

75.

The doctors discussed his pain medication, and whether to put him in a twenty-four-hour care facility. Eventually, the decision was made to send him back to August Correctional Center.

**VIII. Nicholas's inadequate medical care continues after he returns to Augusta Correctional Center.**

76.

Nicholas arrived back at Augusta Correctional Center about two weeks after his surgery.

77.

After Nicholas was back at August Correctional Center, he was still unable to bend his legs, which required braces, and thus struggled to complete basic tasks or take care of himself.

78.

For example, Nicholas had to push himself up to stand, and needed help just sitting on the toilet, as well as getting on and off of it. The prison staff had to get him a device that sat over the toilet that had arm braces on the sides for him to hold onto.

79.

After surgery, Nicholas had to wear leg braces, causing him to be the target of Forrest Gump jokes by the nurses and officers at the prison.

80.

As if recovering from a double knee surgery was not difficult enough on its own, Nicholas also struggled to receive his proper pain medication. Even though he was only being given ibuprofen, days after receiving medication the staff would tell Nicholas that he had run out of pain medicine and would have to submit another request form to receive any more.

81.

Over the course of only one month, Nicholas had to tell the medical staff that he had not received his ibuprofen three separate times.

82.

Nicholas had also been prescribed physical therapy twice weekly by Dr. Harwood, a doctor at August Medical Center, but those instructions were not followed by medical staff within the prison.

83.

In fact, Nicholas was actually told by multiple nurses, such as Nurse V. Damen that the prison did not have to honor the order for physical therapy.

84.

On April 12th, 2021, Nicholas tried to get help by submitting another grievance form stating, "This could affect directly, my ability to recover and hinder

me using my legs. We have arrived at a second week in which there has been no physical therapy. I need treatment."

85.

Nicholas had only been back at Augusta Correctional Center for about two weeks.

86.

Of course, without adequate pain medication, Nicholas was not able to have one quality night's sleep for months on end.

87.

Nicholas's procedure was so serious that he had to stay in the medical unit for three months.

88.

Nicholas always struggled to receive proper care, including regular and effective physical therapy during his stay after Augusta Correctional, after injuring himself.

89.

At one point, Nicholas even injured his lower back because his gait pattern was off due to his injuries.

90.

When he injured his back, he could not even get himself food, let alone complete physical therapy. Because of this, medical staff removed him from the physical therapy list.

91.

However, once Nicholas had recovered enough to start his much-needed physical therapy again, medical staff waited two months before he was put back on the physical therapy list.

## COUNT I
**DEPRIVATION OF EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT BY RECEIVING ACCESS TO ADEQUATE MEDICAL CARE PURSUANT TO 42 U.S.C. § 1983**
*(Federal claim against all Defendants Warden White, Dr. Smith, Nurse Dameron, and Nurse Harlow)*

92.

Plaintiff fully incorporates paragraphs 1-92 and any paragraphs this Court deems relevant as if each were fully stated herein to support this Count.

93.

Defendants' acts and omissions in failing to provide adequate and timely medical care after both of his knees were fractured and their tendons ruptured constitute deliberate indifference to the serious medical needs of Nicholas Price, thereby establishing a violation of the Eighth Amendment of the United States Constitution.

94.

Nicholas Price's serious medical need was obvious because his knees were dislodged, swollen, and discolored and because he visibly struggled to walk and take care of himself. Additionally, Nicholas made the seriousness of his medical need obvious and unambiguous by pleading for adequate and timely medical care over and over, both verbally and through written grievances. To take an example from one of Nicholas' grievances, it would be clear to anyone that an injury preventing someone from being able to use the bathroom by themselves has a serious medical need.

95.

While Nicholas' serious medical need would have been obvious to anyone, the severity of his injuries and urgency of his need for adequate medical care were especially apparent to medical staff. A reasonable doctor would know that a person who has an injury that is visible and causes that person to be unable to care for themselves or walk properly as well as extreme pain has a serious medical need. A reasonable doctor would also know that such an injury could get worse or cause additional injury if not treated immediately.

96.

Defendants had knowledge of Nicholas Price's serious medical need. Staff observed the incident when the injury occurred, and Nicholas had to be carried away.

Nicholas showed his visibly injured knees to staff members. Nicholas submitted grievances describing his pain and disability. Nicholas verbally notified staff of the seriousness of his injuries, even going so far as to protest going into lockdown in a desperate attempt to be taken seriously.

97.

Based upon the facts incorporated into this Count and any other paragraphs this Court deems relevant, all Defendants were deliberately indifferent to Mr. Price's serious medical need, despite fully appreciating his injury and the serious risk of harm posed by his injury. As a result of Defendants' failure to provide adequate medical care, Mr. Price suffered severe pain and suffering and permanent injury to his legs.

## COUNT II
## SUPERVISORY LIABILITY PURSUANT TO 42 USC 1983
### *(Federal Claim against Dr. Smith)*

98.

Plaintiff fully incorporates paragraphs 1-98 and any paragraphs this Court deems relevant as if each were fully stated herein to support this Count.

99.

Based on the incorporated facts to support this count, Dr. Smith condoned and ratified injury-causing conduct of subordinate Defendant nurses whom he supervised at all relevant times by knowing that Plaintiff suffered from visible,

dislodged knee caps and severe pain yet, upon information and belief, ordering nurses to carry our what is obviously inadequate treatment of Plaintiff's injuries, under the circumstances, to include telling Defendant nurses, based on information and belief, that Plaintiff's injuries did not require immediate off site hospitalization because why on earth would Plaintiff not been ordered to the hospital but for Dr. Smith's orders, rhetorically speaking.

## COUNT III
## PUNITIVE DAMAGES
*(Against All Defendants in their individual capacities)*

100.

Plaintiff fully incorporates paragraphs 1-100 and any paragraphs this Court deems relevant as if each were fully stated herein to support this Count.

101.

Plaintiff is entitled to punitive damages, under all applicable laws, because Defendants acted with willful and wanton disregard and deliberate indifference to Mr. Price's rights.

## COUNT IV
## ATTORNEY FEES

102.

Based on the facts alleged in this Complaint, Plaintiff is entitled to attorney fees, under all applicable laws.

**WHEREFORE**, Plaintiff **Nicholas Price** prays for a trial by jury of twelve and judgment against Defendants as follows:

(a) That process issue and service be had on each Defendant;

(b) That judgment be granted in favor of Plaintiff against Defendants, jointly and severally, for all damages permissible at law;

(c) That Plaintiff be awarded all other expenses in an amount to be determined at trial, including special damages, and attorney fees;

(d) That Plaintiff recover all costs of this litigation;

(e) That a jury trial be had on all issues so triable;

(f) That Plaintiff have Judgment against Defendants for punitive damages; and

(g) That Plaintiff receives such other and further relief as this Court deems just and proper.

Respectfully submitted on this 3rd day of March 2023,

/s/ MARIO B. WILLIAMS
Mario B. Williams
Va. Bar No. 91955

**HDR LLC**
44 Broad Street NW, Suite 200
Atlanta, GA 30303
(404) 245-0442
Mwilliams@hdrattorneys.com