CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED
09/17/2025
LAURA A. AUSTIN, CLERK
BY: **/s/ Amy Fansler**
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| NICHOLAS PRICE, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Case No. 5:23-cv-00010 |
| ) | |
| PHILLIP WHITE, *et al.*, ) | By: Elizabeth K. Dillon |
| Defendants. ) | Chief United States District Judge |

**MEMORANDUM OPINION**

Plaintiff Nicholas Price, a former Virginia inmate, filed this civil rights action under 42 U.S.C. § 1983 against defendant Kyle Smith, M.D. ("Dr. Smith"), alleging that Dr. Smith was deliberately indifferent to Price's serious medical needs after he sustained significant knee injuries while playing basketball at Augusta Correctional Center ("ACC").

Pending before the court are Dr. Smith's motion for summary judgment (Dkt. No. 80) and motion to exclude the medical opinions of Price's expert witness, Dr. Michael J. Katz ("Dr. Katz") (Dkt. No. 82). The court held a hearing on both motions on July 22, 2025.[1] For the reasons set forth below, the court will grant both motions.

I. BACKGROUND[2]

At the time of the incidents described, Price was incarcerated by the Virginia Department

---

[1] At the time the motions were filed, three additional defendants—Virginia Damen, Derinda Dameron (Lokey), and Sarah Harlow—remained in the case, each facing a claim of deliberate indifference under 42 U.S.C. § 1983. Price had also asserted a supervisory liability claim under 42 U.S.C. § 1983 against Dr. Smith. However, at the hearing, Price expressly abandoned all claims against Damen, Dameron (Lokey), and Harlow, as well as the supervisory liability claim against Dr. Smith. Accordingly, the only claim remaining before the court is a deliberate indifference claim against the sole remaining defendant, Dr. Smith.

[2] The information in this section is drawn from the summary judgment record, including Price's medical records (Med. Recs., Dkt. No. 81-1), the declaration of Dr. Smith (Smith Decl., Dkt. No. 81-2), the declaration of Price (Price Decl., Dkt. No. 85-1), an emergency grievance filed by Price (Price Emerg. Grievance, Dkt. No. 81-5), and the expert medical opinion of Dr. Michael Katz (Katz Med. Op., Dkt. No. 83-2.). It provides a summary of the undisputed material facts, with a focus on the nature of Price's injury and the medical treatment provided by Dr. Smith.

of Corrections and housed at ACC.  (Price Decl. ¶ 1.)  On Saturday, March 6, 2021, while playing basketball in the "rec" yard, Price fell and severely injured both of his knees.  (*Id.*)  Nursing staff responded to the scene, provided ice for his knees, and contacted the on-call physician, Dr. Shyam Singareddy.  Dr. Singareddy issued a verbal order for ibuprofen, crutches, and a bottom bunk assignment—though Price already had a bottom bunk.  (Med. Recs. 82; Smith Decl. ¶ 7; Price Decl. ¶ 2.)  A follow-up appointment was scheduled with Dr. Smith for Monday, March 8, 2021.  (Med. Recs. 82; Smith Decl. ¶ 7.)

Later the day of the accident, Price submitted an emergency grievance, stating: "My knees are in excruciating pain, I can't bend both my knees and my knee[]caps are dislocated and swollen.  I need to go to the hospital."  (Price Emerg. Grievance; Smith Decl. ¶ 8.)  The on-call nurse responded that it was not an emergency, noting Price had already been evaluated that day, provided crutches and ibuprofen, and was scheduled for follow-up care on Monday.  (*Id.*)

However, Price was not seen by Dr. Smith on Monday, March 8, 2021.  Instead, he was evaluated by Nurse T. Hamilton at 4:35 p.m.  (Med. Recs. 81; Smith Decl. ¶ 9.)  She documented that Price could not stand without assistance, could not bend either knee, and was experiencing constant pain rated at 4/10, which increased to 8/10 when standing.  (Med. Recs. 81.)  After assessing Price, Nurse Hamilton contacted Dr. Smith for a verbal consultation.  (*Id.* at 80.)  Following their conversation, Dr. Smith issued a verbal order for a walker, ibuprofen 800mg three times daily, Tylenol 1000mg three times daily, and for Price to be admitted to the Medical Observation Unit (MOU).  (*Id.*)

Following the appointment, Price was admitted to the MOU around 5:30 p.m.  (Med. Rec. 79; Price Decl. ¶ 6.)  The next morning at approximately 9:30 a.m., Dr. Smith saw Price in person for the first time regarding his knee injuries.  (Med. Recs. 77; Smith Decl. ¶ 12.)  Dr.

Smith observed swelling, bruising around the knees, limited range of motion, and severe pain upon knee flexion. (*Id.*) He prescribed prednisone 60mg daily for five days, ordered bilateral knee x-rays, and noted that Price would likely require an MRI and orthopedic referral later that week, pending the x-ray results. (*Id.*)

X-rays were completed that same day, with final reports issued at 6:09 p.m., revealing avulsion fractures and patella displacements in both knees. (Med. Recs. 5, 6; Smith. Decl. ¶ 14; Price Decl. ¶ 7.) Dr. Smith reviewed the X-ray reports the following morning, on March 10, 2021, and noted his plan to obtain an orthopedic referral within 48 hours. (Med. Recs. 76, Smith Decl. ¶ 16.)

On Thursday, March 11, 2021, Dr. Smith met with Price to discuss the imaging results, confirming bilateral avulsion fractures and patellar displacements. (Med. Recs. 75; Smith Decl. ¶ 18; Price Decl. ¶ 7.) In his medical notes, Dr. Smith recorded that Price was very upset about the time it took for him to receive treatment. (*Id.*) They discussed a treatment plan going forward, including the need to "see[] an orthopedist on an urgent basis[.]" (Med. Recs. 75; Smith Decl. ¶ 18.)

Transportation was arranged for Price to be taken from ACC to Augusta Health's Emergency Department ("Augusta Health") for an orthopedic consultation on Saturday, March 13, 2021. Medical records show that Dr. Smith followed up after hours at approximately 7:30 p.m. on Friday, March 12, to ensure all preparations were in order. (Med. Recs. 73.)

On the morning of March 13, the originally arranged van was unable to transport Price because he could not bend his knees sufficiently to enter the vehicle. (*Id.* at 72; Price Decl. ¶ 8.) However, this was quickly remedied by arranging an ambulance to transport him to Augusta Health. (*Id.*) ACC medical staff was notified at 12:55 p.m. that Price had been successfully

3

transported to the medical facility. (Medical Recs. 72.)

At Augusta Health, additional X-rays were taken upon Price's arrival, and bilateral knee MRIs were performed the following day, on Sunday, March 14, 2021. (Med. Recs. 50–55.) The MRIs revealed full-thickness tears of both patellar tendons. (*Id.*)

On Tuesday, March 16, 2021, Price underwent surgical repair of both patellar tendons, performed by Dr. Ramen Esteban and Dr. Jared Hardwood. (Med. Recs. 40–41; 60–62.) He remained at Augusta Health until March 24, 2021, after which he was discharged and transported back to ACC. (*Id.* at 33–35.) Price's discharge summary from Augusta Health noted the following:

> Postoperatively, he did well with minimal to moderate discomfort and minimal swelling. . . . Physical therapy was consulted to work with him on ambulation, weightbearing as tolerated with knee immobilizers on at all times. He progressed well with therapy and was ambulating with the rolling walker, minimal assistance 50 feet with knee immobilizers in place with knees maintaining full extension. . . . The patient will continue wearing the knee immobilizer at all times, except for removal while knee is in full extension for hygiene. He will be able to ambulate weightbearing as tolerated to both lower extremities with knee immobilizers in place. The patient is being discharged back to the correctional facility in satisfactory condition and will return to the office for a followup appointment on 04/01/2021 at 1 p.m.

(*Id.*)

On the date of his return, Dr. Smith saw Price and noted that he was ambulatory, wearing knee immobilizers, and reported no complaints. (Med. Recs. 71; Smith Decl. ¶ 28.) Over the course of the next several months, Price attended multiple follow-up appointments with Dr. Smith and Augusta Health and began physical therapy in mid-April 2021. He was discharged from physical therapy on October 12, 2021, after refusing to attend two consecutive scheduled appointments. (Med. Recs. 9–11; Smith Decl. ¶ 41.)

On May 23, 2022, Dr. Smith saw Price for an unrelated health issue but, as part of a

4

general health assessment, inquired about his knees.  Price reported that he "does all sorts of exercise on a regular basis—running, lifting, calisthenics—without any symptoms." (Med. Recs. 64; Smith Decl. ¶ 43.)  Price was released from custody at ACC on or around August 11, 2022. (Med. Recs. 63.)  On March 3, 2023, Price filed this action against Dr. Smith, alleging that Dr. Smith failed to provide adequate and timely medical care, constituting deliberate indifference to his serious medical needs in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.  (Compl., Dkt. No. 1.)

In support of his claim against Dr. Smith, Price retained Dr. Katz to review his medical records from Augusta Health to discuss the following question:

> Did the delay in treatment for his bilateral knee injury, caused by the prison's medical unit's failure to refer him for treatment in a timely manner, fall below the minimum standard of care?

(Katz Med. Op. 1.)  In his expert report, Dr. Katz opined that "Price's treatment at Augusta Correctional Center did not meet the standard of care.  Patellar tendon ruptures do need prompt treatment and usually involves prompt surgical repair." (*Id.* at 4.)  Based on his review, Dr. Katz concluded that "the delay in receiving the appropriate treatment caused Mr. Price's injury to worsen significantly, and but for violating the applicable standard of care, Mr. Price's injury would not be as it is now." (*Id.*)

Dr. Smith now moves the court to exclude Dr. Katz's medical opinions[3] and to grant summary judgment in his favor,

## II.  DISCUSSION

Because Price relies on Dr. Katz's expert medical report in opposing Dr. Smith's motion for summary judgment, the court will first address Dr. Smith's motion to exclude Dr. Katz's

---

[3] Dr. Katz's expert medical report is referred to interchangeably as "medical opinions" and "expert medical report."  All references pertain to the same document.  (*See* Katz Med. Op.)

5

medical opinions before considering the summary judgment motion.

## A. Dr. Smith's Motion to Exclude Dr. Katz's Medical Opinions

Dr. Smith moves to exclude the medical opinions of Dr. Katz on two main grounds: (1) that Dr. Katz's expert designation does not comply with Federal Rule of Civil Procedure 26; and (2) that his medical opinions are inadmissible under Federal Rule of Evidence 702. (Dkt. No. 82.) For the reasons explained below, the court agrees with Dr. Smith and will grant his motion to exclude Dr. Katz's medical opinions.

### 1. Dr. Katz's expert medical report fails to comply with the disclosure requirements set forth in Federal Rule of Civil Procedure 26.

*a. Legal standard*

Rule 26(a)(2) governs the disclosure requirements for expert testimony. *See* Fed. R. Civ. P. 26(a)(2). Rule 26(a)(2)(B) provides that each party disclose the identity and report of any witness who is retained to provide expert testimony. The report must contain:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case.

(*Id.*) "The purpose of Rule 26(a) is to allow litigants 'to adequately prepare their cases for trial and to avoid unfair surprise.'" *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 190 (4th Cir. 2017) (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014). Accordingly, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) [], the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

6

Fed. R. Civ. P. 37(c)(1).

"District courts are accorded 'broad discretion' in determining whether a party's nondisclosure or untimely disclosure of evidence is substantially justified or harmless." *Bresler*, 855 F.3d at 190 (internal citations omitted). In making this determination, courts consider the following factors:

> (1) the surprise to the party against whom the evidence is offered; (2) that party's ability to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose.

*Id.* (citing *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003)). The first four factors primarily relate to the harmlessness exception, while the fifth factor—the explanation for the nondisclosure—relates mainly to the substantial justification exception. *Id.* The burden rests with the party who failed to disclose the information to demonstrate that the nondisclosure was either substantially justified or harmless. *Id.*

    *b. Analysis*

Dr. Katz's expert report does not fully comply with the disclosure requirements set forth in Federal Rule of Civil Procedure 26(a)(2)(B). Although the report contains some of the necessary components, it omits several critical elements mandated by the Rule and thus falls short of the required standard for expert disclosures.

To begin, Rule 26(a)(2)(B)(i) requires that an expert report include a complete statement of all opinions the witness will express, along with the basis and reasons for those opinions. Dr. Katz states his principal conclusion—that the delay in treatment for Price's bilateral patellar tendon ruptures constituted a deviation from the standard of care and was the proximate cause of Price's worsened condition. (Katz Med. Op. 4.) He further notes that such injuries require prompt surgical repair. (*Id.*) While this constitutes a basic statement of opinion, it is brief and

7

conclusory, lacking meaningful detail or explanation. Courts within the Fourth Circuit have found conclusory findings insufficient to satisfy the requirements of Rule 26(a)(2)(B)(i). *See e.g.*, *McNeal v. Nelson Bros., LLC*, No. 2:09-CV-00306, 2011 WL 1087477, at *7 (S.D.W. Va. Feb. 24, 2011), *report and recommendation adopted*, No. CIV.A. 2:09-0306, 2011 WL 1087473 (S.D.W. Va. Mar. 22, 2011) (noting that an expert witness's conclusory findings of causation in relation to negligence and strict liability claims are insufficient to meet the requirements of Fed. R. Civ. P. 26(a)(2)(B)(i)); *Mitchell v. Mayflower Transit*, LLC, No. 2:24CV308, 2025 WL 1098569, at *3 (E.D. Va. Apr. 14, 2025) ("[C]onclusory opinions [] are insufficient for an expert disclosure."(internal citation omitted)).

Dr. Katz's report spans fewer than three full pages and contains no meaningful discussion of the reasoning or methodology underlying his conclusions. While he asserts that the ACC's delay in providing medical care fell below the standard of care, he does not define the standard, nor does he explain the factual or clinical basis for his opinion. Price was transferred to Augusta Health just over a week after his injury and underwent surgery 10 days post-injury. Although Dr. Katz asserts that patellar tendon ruptures require "prompt" treatment, he never specifies what "prompt" means in this context.

Further, while the report lists medical records from Augusta Health that Dr. Katz reviewed, notably absent from his review are any records from ACC, where the alleged delay occurred and where Dr. Smith provided care. Without reviewing those records, the court fails to see how Dr. Katz can reliably opine on the standard of care provided by ACC or upon Price's current condition. This absence undermines the factual basis for his opinions. Thus, the report fails to meet the requirements of Rule 26(a)(2)(B)(i).

Furthermore, Dr. Katz's report fails to include a list of prior cases in which he has

8

testified as an expert at trial or by deposition within the last four years, in violation of Rule 26(a)(2)(B)(v).  While he notes that he has "served as an expert in many knee cases in the past[,]" he does not identify any of those cases.  (Katz Med. Op. 3.)  Also omitted is any statement of compensation for Dr. Katz's services in this matter, which is expressly required under subsection (vi).  *See* Fed. R. Civ. P. 26(a)(2)(B)(vi).  As noted above, "[t]he purpose of Rule 26(a) is to allow litigants 'to adequately prepare their cases for trial and to avoid unfair surprise.'"  *Bresler*, 855 F.3d at 190 (quoting *Russell*, 763 F.3d at 396).  These are not minor omissions—they are necessary disclosures designed to ensure fairness and transparency in the expert discovery process.

In sum, Dr. Katz's expert report fails to satisfy multiple subsections of Rule 26(a)(2)(B), including those related to the basis for his opinions, prior expert testimony, and compensation.  These deficiencies are not merely technical or procedural.  They go to the core of what Rule 26 is designed to ensure—that opposing parties have a full and fair opportunity to evaluate and challenge expert testimony prior to trial.  Accordingly, it is within the discretion of the court to exclude Dr. Katz's expert medical opinions under Federal Rule of Civil Procedure 37(c)(1), absent a showing by Price that his failure to disclose this information was substantially justified or harmless.

After careful review of Price's reply brief to Dr. Smith's motion to exclude Dr. Katz's expert opinion (Dkt. No. 86), and after the court's hearing on the motion conducted on July 22, 2025, the court finds that Price has failed to meet his burden of demonstrating that the aforementioned nondisclosures were either substantially justified or harmless.

Despite having notice of the deficiencies in Dr. Katz's expert report—which include the failure to provide an adequate basis and reasons for his conclusion, failure to disclose

9

compensation, and failure to disclose prior cases where he provided expert testimony—Price made no effort to cure these omissions. Some of these shortcomings, such as providing a list of cases in which Dr. Katz has testified or a simple compensation statement, would appear relatively easy to correct. Yet, as of the time of the court's review, nothing in the record indicates that Price has supplemented the disclosure or produced the missing information to Dr. Smith. In the absence of any explanation from Price or his counsel, and in light of the record before the court, the deficiencies cannot be deemed substantially justified. Nor can they be considered harmless, as they deny Dr. Smith the opportunity to fairly assess and respond to the credibility and reliability of Dr. Katz's opinions. Accordingly, exclusion of Dr. Katz's expert report is appropriate under Federal Rule of Civil Procedure 37(c)(1).[4]

**2. Dr. Katz's medical opinion is not admissible under Fed. R. Evid. 702.**

Even assuming, arguendo, that Dr. Katz's expert medical report satisfies the disclosure requirements of Federal Rule of Civil Procedure 26, it nevertheless fails to meet the admissibility standards set forth in Federal Rule of Evidence 702.

*a. Legal standard*

"Under Fed. R. Evid. 702, trial judges act as gatekeepers to 'ensure that any and all [expert] testimony . . . is not only relevant, but reliable.'" *Sommerville v. Union Carbide Corp.*, No. 24-1491, 2025 WL 2383496, at *7 (4th Cir. Aug. 18, 2025) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588, 113 (1993). The framework established in *Daubert* is now

---

[4] In his motion to exclude Dr. Katz's medical opinions, Dr. Smith also raised procedural objections to the expert report—namely, that it was untimely and lacked a signature. (*See* Dkt. No. 83, 3–7.) In response, Price argued that these procedural issues caused no prejudice to Dr. Smith. (*See generally* Dkt. No. 86.) Price's reply brief and oral argument focused primarily on rebutting those procedural objections. However, Price failed to address the substantive deficiencies identified under subsections (i), (v), and (iv) of Rule 26(a)(2)(B), let alone demonstrate that those deficiencies were substantially justified or harmless. (*Id.*) Although the court does not address the timeliness or missing signature in its opinion—finding that those issues did not result in any meaningful prejudice to Dr. Smith—Price has not met his burden to show that the substantive deficiencies were substantially justified or harmless.

codified in Rule 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"[A] trial judge, faced with a proffer of expert [] testimony, must conduct 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Sommerville*, No. 24-1491, 2025 WL 2383496, at *7 (quoting *Daubert*, 509 U.S. at 592–93). The burden of establishing admissibility under Rule 702 lies with the party offering the expert testimony and must be satisfied by a preponderance of the evidence. *Id.*; Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendment. "[T]he objective of *Daubert's* gatekeeping requirement is to 'make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Sommerville*, No. 24-1491, 2025 WL 2383496, at *7 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Trial courts are afforded "broad latitude" in determining how to decide whether an expert's opinion is reliable. *See Kumho Tire Co.*, 526 U.S. at 153.

  b. *Analysis*

Dr. Katz's expert report fails to satisfy the four requirements of Rule 702. Specifically, it lacks sufficient factual foundation (702(b)), does not reflect reliable principles or methods (702(c)), fails to apply any discernible methodology to the facts (702(d)), and offers opinions that are not relevant to the legal issue before the court (702(a)).

11

While Dr. Katz lists the records he reviewed, they consist solely of Augusta Health records from March 13 to March 24, 2021—after the alleged delay in care had already occurred. He did not review any medical records from ACC, the facility where the delay allegedly took place, nor did he examine any documentation regarding the care provided by Dr. Smith, the sole remaining defendant in the case. Additionally, he opined that the delay caused the injury to worsen, but did not identify how it worsened, or any facts or records upon which he bases this opinion. The last medical records he reviewed were Augusta Health's discharge records, eight days after surgery—when Price was still wearing knee immobilizers. He did not review the condition of Price's knee, or the treatment thereof, before arriving at Augusta Health, nor did he evaluate the rehabilitation records that occurred after his stay at Augusta Health.

These omissions are critical. Dr. Katz's conclusion—that the delay in treatment at ACC caused Price's injury to worsen—depends upon knowing what care was provided, when, and by whom. Without having reviewed any records from ACC, his opinion rests on an incomplete and selective factual basis, which courts have held to be inadmissible. *See Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) ("An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record.") Accordingly, Dr. Katz's medical opinions are not "based on sufficient facts or data" under Rule 702(b).

Dr. Katz also offers no explanation of the principles or methodology used to reach his conclusion. His report contains no citation to clinical guidelines, medical literature, or established standards of care regarding the treatment of bilateral patella tendon ruptures. Instead, he simply asserts that the:

> Patellar tendon ruptures do need prompt treatment and usually involves prompt surgical repair. . . . the delay in receiving the

12

>appropriate treatment [at ACC] caused Mr. Price's injury to worsen significantly, and but for violating the applicable standard of care, Mr. Price's injury would not be as it is now.

(Katz. Med. Op. 4.) These statements are conclusory. Dr. Katz does not define what the standard of care is, does not identify how it was violated, and does not indicate what constitutes "prompt" treatment under the circumstances. *See Daubert*, 509 U.S. at 590 (noting expert testimony under Rule 702 requires "more than subjective belief or unsupported speculation"). Therefore, Dr. Katz's medical report fails to reflect the "product of reliable principles and methods" as required under Rule 702(c).

And because Dr. Katz's opinions are not based on sufficient facts or data, and no methodology or principles are articulated—much less applied—it necessarily follows that his opinion fails to meet the requirements of Rule 702(d). He does not reliably apply "the principles and methods to the facts of the case" because there are no discernable principles or methods applied in the first place. Fed. R. Evid. 702(d).

Finally, even if Dr. Katz's opinions were otherwise admissible under Rule 702(b)–(d), the report would still fail under 702(a) because it does not "help the trier of fact to understand the evidence or to determine a fact in issue." The legal issue in this case is not medical negligence, but deliberate indifference to serious medical needs under the Eighth Amendment. *See Baynard v. Malone*, 268 F.3d 228, 236 (4th Cir. 2001) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."). Dr. Katz was asked to opine on a question rooted in negligence: whether the delay in treatment "f[e]ll below the minimum standard of care." (Katz Med. Op. 2.) But this does not address the constitutional threshold of deliberate indifference and thus has no relevance to the central legal question in this case.

In sum, Dr. Katz's report fails to satisfy any of the four foundational prongs of Rule 702. It is not based on sufficient facts or data, does not reflect or apply reliable principles or methods,

and is not relevant to the legal claim of deliberate indifference.  Accordingly, Dr. Katz medical report and opinions contained therein will be excluded in their entirety and will not be considered in evaluating Dr. Smith's motion for summary judgment.

### B. Dr. Smith's Motion for Summary Judgment

Dr. Smith moves for summary judgment, arguing that Price "has no valid claim for deliberate indifference against [him] as [Price's] allegations amount to, at most, a dispute over the course and timing of his medical treatment which does not support a cognizable claim."  (Br. Supp. Mot. Summ. J. 3, Dkt. No. 81.)  In response, Price argues that Dr. Smith "was aware of the seriousness of the injuries yet directed Price be given treatment akin to that prescribed for a sprained ankle."  (Br. Opp'n Mot. Summ. J. 2, Dkt. No. 85.)  He maintains that genuine disputes of material fact remain as to whether Dr. Smith was deliberately indifferent to his serious medical needs—particularly concerning the alleged delay in care—and therefore requests that the court deny the motion.  (*Id.* at 7–9.)

For the reasons set forth below, the court finds that no genuine dispute of material fact exists and that no reasonable jury could find Dr. Smith was deliberately indifferent to Price's serious medical needs.  Accordingly, Dr. Smith's motion for summary judgment will be granted.

#### 1. Summary judgment standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party.  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citation modified).  In making that determination, the court "may not credit the movant's contrary evidence, weigh the evidence, or resolve factual disputes in the movant's favor, even if a jury could well believe the evidence forecast by the movant."  *Quinn v. Zerkle*,

14

111 F.4th 281, 290 (4th Cir. 2024). Instead, the court must "view the undisputed facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Id.*

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007).

**2. Eighth Amendment deliberate indifference standard**

"It is beyond debate that a prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (internal citations and quotations omitted). To demonstrate deliberate indifference, an inmate must show that (1) he has a medical condition that has been "diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" and (2) the defendant "had actual knowledge of the plaintiff's serious medical needs and the related risks, but nevertheless disregarded them." *Id.* at 356–57 (citation modified). The first component is an objective inquiry and the second is subjective. *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017); *see also Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

The fact that an inmate received some medical care does not, by itself, establish that the treatment was constitutionally adequate. *De'Lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013). At the same time, mere disagreements between an inmate and medical staff regarding the

15

appropriate course of treatment do not amount to deliberate indifference. *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *see also Phoenix v. Amonette*, 95 F.4th 852, 859 (4th Cir. 2024) (emphasizing that such disagreements "do not cut it"). Furthermore, "in the Eighth Amendment context, questions of medical judgment are generally 'not subject to judicial review.'" *Griffin v. Mortier*, 837 F. App'x 166, 171 (4th Cir. 2020) (quoting *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975)). To qualify as deliberate indifference, the defendant's conduct "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837; *see also Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (explaining that deliberate indifference is "more than mere negligence," but "less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result" and that it is akin to subjective recklessness in criminal law).

### 3. Analysis

For the purposes of this motion, Dr. Smith does not dispute—without admitting—the objective prong of the deliberate indifference analysis: that Price's knee injuries constituted a serious medical need. (Br. Supp. Mot. Summ. J. 17.) Accordingly, the court's analysis focuses solely on the subjective prong—whether Dr. Smith acted with deliberate indifference to that serious medical need.

To survive summary judgment on his Eighth Amendment claim, Price must present sufficient evidence from which a reasonable jury could conclude that Dr. Smith "knew of and disregarded an excessive risk" to Price's health. *Amonette*, 95 F.4th at 859. That standard is a high bar. *Id.* As noted above, it is not enough to show medical negligence or a disagreement over treatment. *See Lightsey*, 775 F.3d at 178 (4th Cir. 2014). Instead, the defendant's conduct

16

"must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier*, 896 F.2d at 851.

Here, the undisputed evidence in the record demonstrates that Dr. Smith responded to Price's injuries in a timely and medically appropriate manner once he became involved in Price's care. No reasonable jury could find otherwise.

Price was injured on Saturday, March 6, 2021. Medical staff responded immediately, provided pain medication and crutches, and consulted with the on-call physician (not Dr. Smith), who issued initial treatment orders. A follow-up appointment was scheduled with Dr. Smith for the next business day, Monday, March 8. Although Dr. Smith did not see Price that day, Nurse Hamilton evaluated him, observed significant pain and immobility, and consulted Dr. Smith by phone. Dr. Smith ordered stronger medications, a walker, and that Price be admitted to the Medical Observation Unit, where he was admitted that evening.

The following morning, Tuesday, March 9, Dr. Smith evaluated Price in person, documented severe symptoms, ordered X-rays, and prescribed prednisone. The X-ray results, available that evening, showed bilateral avulsion fractures and patellar displacement. Dr. Smith reviewed the findings the next morning and initiated an orthopedic referral.

On Thursday, March 11, Dr. Smith met with Price again, discussed the injury and plan of care, and emphasized the urgency of seeing an orthopedist. By Friday evening, Dr. Smith followed up after hours to confirm arrangements for Price to be transported to Augusta Health the next morning. When initial transportation failed due to Price's inability to bend his knees to fit inside the transport van, an ambulance was promptly arranged, and Price arrived at Augusta Health by early Saturday afternoon—one week after his injury.

At Augusta Health, further diagnostic imaging was performed, and Price underwent successful bilateral patellar tendon surgery on March 16—three days after his arrival at the hospital and ten days after the initial injury. He remained at Augusta Health for post-operative care until his discharge on March 24.

Upon his return to ACC, Dr. Smith resumed Price's care, noting that he was ambulatory and had no complaints. Dr. Smith later ordered physical therapy and documented that Price was capable of regular exercise without symptoms as of May 2022.

Even when viewing the undisputed facts—and all reasonable inferences drawn therefrom—in the light most favorable to Price, no reasonable jury could conclude that Dr. Smith acted with deliberate indifference. To the contrary, the record shows that Dr. Smith evaluated Price, ordered imaging, escalated care upon receiving results, facilitated a hospital transfer, and helped manage his post-operative recovery. Nothing in this course of treatment suggests that Dr. Smith disregarded an excessive risk to Price's health, let alone acted in a manner that would "shock the conscience." *Miltier*, 896 F.2d at 851.

Price argues that Dr. Smith's care amounted to mere treatment "akin to that prescribed for a sprained ankle." He relies on his own declaration and the report of Dr. Katz to support his claim that the delay in treatment was constitutionally deficient. (Br. Opp'n Mot. Summ. J. 2.) But Price cites no medical records to support his claims. Moreover, as previously discussed, the court will not consider Dr. Katz's report because it fails to satisfy the disclosure requirements of Federal Rule of Civil Procedure 26 or the admissibility standards of Federal Rule of Evidence 702. (*See* discussion *supra* Sec. II.A.)

Price's self-serving and conclusory allegations—unsupported by medical evidence—are not sufficient to create a genuine dispute of material fact. A party's "self-serving opinion []

18

cannot, absent objective corroboration, defeat summary judgment." *Williams v. Giant Food*, Inc., 370 F.3d 423, 433 (4th Cir. 2004) (citing *National Enters., Inc. v. Barnes*, 201 F.3d 331, 335 (4th Cir. 2000)). That is precisely the case here.[5]

In short, while the court does not minimize the seriousness of Price's injuries, the undisputed record shows that Dr. Smith responded with a range of treatments, timely referrals, and appropriate follow-up—conduct that no reasonable jury could find rises to the level of conduct that "shocks the conscience." Disagreements over timing and treatment protocol, even if sincere, do not amount to constitutional violations. *See* Lightsey, 775 F.3d at 178.

Furthermore, courts have found that even longer delays in surgical treatment for knee injuries have not survived summary judgment in cases involving Eighth Amendment deliberate indifference claims. *See e.g.*, *Hudgins v. Mullins*, No. 7:22-CV-00170, 2025 WL 978227, at *7–9 (W.D. Va. Mar. 31, 2025) (granting summary judgment for the defendant where, despite surgery occurring over a year after the plaintiff's initial knee injury, the court found that a twelve-week delay in completing an orthopedic referral did not constitute deliberate indifference); *Morrell v. United States*, No. CIV.A. 5:05CV171, 2007 WL 1097871, at *3–4 (N.D.W. Va. Apr. 12, 2007) (granting summary judgment for defendants where the plaintiff was promptly seen and received an X-ray two days after his knee injury, was referred for an MRI (obtained within a month), and although the orthopedic consultation occurred about two months later with surgery following, the delay in obtaining the MRI and treatment did not constitute deliberate indifference under the Eighth Amendment).

---

[5] The court notes that Price's declaration contains statements that directly contradict allegations in his complaint. For example, Price's declaration asserts that the medical unit took eight hours to respond to his emergency grievance, whereas his complaint alleges a response time of just over two hours, supported by the attached grievance document with time stamps. (*Compare* Price Decl. ¶ 3, with Compl. ¶ 38.)

19

In light of the foregoing, no reasonable jury could find that Dr. Smith acted with deliberate indifference to Price's serious medical needs. Based on the undisputed evidence in the record and in accordance with binding legal precedent, the court finds that Dr. Smith is entitled to summary judgment as a matter of law. Accordingly, the court will grant Dr. Smith's motion for summary judgment.

### III.  CONCLUSION

For the reasons set forth above, the court will grant Dr. Smith's motion to exclude the medical opinions of Price's expert witness, Dr. Katz, and will also grant Dr. Smith's motion for summary judgment. An appropriate order will be entered.

Entered: September 17, 2025.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
Chief United States District Judge